## OLIVER P. CHANDLER *v.* ARAUNAH SPEAR.*

When the statute, under which land is sold for taxes, directs an act to be done, or prescribes the form, time and manner of doing any act, such act must be done, and in the form, time and manner prescribed, or the title is invalid; and in this respect the statute must be strictly, if not literally, complied with. But in determining what is required to be done, the statute must receive a reasonable construction; and when no particular form or manner of doing an act is prescribed, any mode, which effects the object with reasonable certainty, is sufficient.

By the statute of November 11, 1807, assessing a tax for building a state's prison, and directing the treasurer of the state to issue his warrants to the sheriffs in the several counties in the state, authorizing and directing them to collect the tax on all the land in the several towns and gores, in their respective counties, which had not returned their list that year, the duty of collecting the tax was added to the other duties of the sheriff, and it is no objection to the validity of a sale by the sheriff, that the warrant from the treasurer of the state was directed to him as sheriff, without naming him, and that he signed all his proceedings, and his deeds, as sheriff, and not as collector.

Nor is it any objection, that the treasurer's warrant merely named the towns and gores, in which the sheriff was directed to collect the tax, without stating, that they were within his precincts, or in what county they were, or that they were unorganized towns, and without giving any reason, why the warrant was directed to the sheriff, rather than to the first constable,—it not being shown, that there was any error in the warrant. The warrant having been issued by a public officer, under the provisions of the statute, he is to be presumed to have performed his duty, until the contrary appears.

Nor is it any objection, that in the caption of the rate bill, as appearing upon record, there is an omission, in reciting the title of the statute assessing the tax, of the word " prison,"—the identity of the tax assessed in the rate bill with that described in the treasurer's warrant appearing sufficiently, notwithstanding the omission.

Nor is it any objection, that there is an error in the rate bill, in stating the quantity of land belonging to each right, the tax assessed upon each right being in fact stated at the proper sum. It was not necessary, that the particulars of the basis of the tax should be stated in the rate bill, but only that it should clearly show the correct sums, which each proprietor was liable to pay.

---

* This case was argued at the July Adjourned Term, 1848, but the decision of the court was pronounced at the present term.

Chandler *v.* Spear.

So, the omission to state the year, in the date of the sheriff's certificate upon the rate bill, that it was a true rate bill, is unimportant, if the year is sufficiently certain from other parts of the instrument.

The statute, in this case, required, that the proceedings should be recorded within thirty days after the termination of the sale. The sale was made April 6, 1808, and the clerk's certificate of the record of the rate bill stated, that the record was made April 30, 1807. The statute was passed November 11, 1807, and the certificate of the record of the warrant, which immediately preceded the record of the rate bill upon the book of records, and the record of the return of sales, which immediately followed the record of the rate bill upon the same book, were both certified to have been made April 30, 1808, and the original rate bill was produced, upon which was the clerk's certificate, that it was recorded April 30, 1808, and it was held, that it was sufficiently certain, that the record of the rate bill was made in due time, notwithstanding the error in the date of the certificate. The certificate of the clerk, in such case, is but *prima facie* evidence of the time, when the record was made.

It is no objection to a sale, under that statute, of land in unorganized towns and gores, by the sheriff, that the sale was made at the court house of the county, and not in the town, in which the land is situated.

Under the statute it was necessary, that the sheriff's advertisement of his sale should be properly recorded; but it was not necessary, that the record should show, that the advertisement was properly published. That may be proved by other evidence.

Where it was stated, in the sheriff's return of his sales, under that statute, that he sold the rights, " or such parts of them as were requisite to discharge said tax and costs on each of such lots, or rights, respectively," and he sold the whole of each right in one township, it was held, that it was sufficiently shown, that the reason for the sale of the whole of each right was, that no person would pay the tax for less than the whole.

The provision in section seventeen of the statute, requiring the secretary of state to cause the statute to be published in all the newspapers in the state, immediately after the adjournment of the legislature, was directory merely, and not essential to the validity of the tax.

The principle of law in this state, that a person entering into possession of any portion of the land specifically described in a deed, claiming title to all the land so described, is constructively in the possession of the whole, applies only to cases, where the quantity of the land and the attendant circumstances reasonably induce the belief, that the land was purchased and entered upon for the ordinary purposes of cultivation and use, but has no application to a case,

where a person takes and maintains possession of a few acres of land in an uncultivated township, for the mere purpose of thereby gaining a title to the entire township by possession, to the exclusion of the rightful owners.

The defendant gave a written license to two persons to take logs from the land of the plaintiff. One of the two died, but the other, acting by virtue of his license, and without any indication of a disposition on the part of the defendant to treat the license as revoked, subsequently took the logs. And it was held, that the license was not revoked by the decease of one of the persons to whom it was given, but that the defendant was liable, as a trespasser, for the logs so taken.

It is no objection to a deposition, taken to be used before the county court, that the place of holding the court is not stated in the caption, the county in which it is to be used and the time of holding the session being correctly stated.

Although the name of the grantor in a deed is *defectively* stated in the certificate of the acknowledgment, yet if it appear from the whole instrument, with reasonable certainty, that it was acknowledged by the grantor, it is sufficient.

Although the non-joinder of a part owner of a chattel may, in actions *ex delicto*, be pleaded in abatement, yet, if the defendant neglect to make such plea, he may still avail himself of a want of title in the plaintiff to the whole, for the purpose of reducing the damages.

When a judgment of the county court is found to be erroneous, and it can be ascertained by computation, what the judgment ought to have been, the correction will be made in the supreme court, without remanding the case to the county court for a new trial.

TRESPASS *de bonis asportatis* for a quantity of pine logs. Plea, the general issue, and trial by the jury, May Term, 1847,—RED-FIELD, J., presiding.

On trial the plaintiff gave in evidence the charter of the town of Norton in the county of Essex, showing that the township was originally divided into sixty five rights, or shares. The plaintiff then gave in evidence various deeds, purporting to convey to Timothy Phelps the undivided rights, or shares, of twenty eight of the original proprietors in the township; all of which were objected to, but admitted by the court. The plaintiff then gave in evidence conveyances of the same twenty eight shares, through several intermediate grantees, to Justin Ely.

The plaintiff also gave in evidence two deeds from William

Hewes, sheriff, to Justin Ely, dated April 18, 1809, purporting to convey to him fifty seven undivided shares in Norton, sold for the non-payment of a tax, assessed by the statute of November 11, 1807, entitled " an act assessing a tax of one cent on each acre of land in this state, for the purpose of defraying the expense of erecting a state's prison;" and also a deed from William Hewes, sheriff, of the same date, to Timothy Hinman, purporting to convey to him two undivided shares in Norton, for non-payment of the same tax. The plaintiff also gave in evidence the record of the warrant from the treasurer of the state, dated December 10, 1807, directed to the sheriff of the county of Essex, without naming him, directing him to collect the tax assessed by said statute of the proprietors of certain towns and gores, which were named, with the number of acres in each, among which was the town of Norton ; but it was not stated, that the towns and gores therein named were unorganized. This was certified to have been recorded April 30, 1808. The plaintiff then gave in evidence the record of the rate bill, which purported to have been made by William Hewes, sheriff. The caption of the rate bill, as recorded, was in these words,—" The following is a rate bill for the collection of the tax of one cent on each acre of land in the unorganized towns and gores of land in the county of Essex, agreeable to an act entitled an act assessing a tax of one cent on each acre of land in this state for the purpose of defraying expenses of erecting a *state's,* passed November 11, 1807." Then followed a list of the names of the proprietors of Norton, with the number of acres belonging to each, and the amount of each one's tax ; the tax against each one being stated at the same sum, but the number of acres belonging to the share being stated in some instances as 320 acres, and in others as 350 acres. Then followed a record of the certificate, dated February 10, 1808, that the foregoing was a true list, or rate bill, signed " William Hewes, sheriff." Then followed a certificate of the paid and unpaid taxes, signed " William Hewes, sheriff." And then followed the certificate of the clerk, in these words,—" Essex, ss. County Clerk's office, April 30th 1807, the foregoing rate bill was received and duly recorded ;" which was signed by the clerk. The plaintiff then gave in evidence the original rate bill, the caption of which was in the words above stated as recorded, except that the word " prison " was added after

the word "state's;" and the shares were all stated upon it as 350
acres each; but the sheriff's certificate, that it was a true rate bill,
was dated "February 10th," omitting the year; and the certificate
of the clerk stated, that the rate bill was received for record and re-
corded April 30, 1808.  The plaintiff then gave in evidence the
original advertisements of the sale, published in the "North Star,"
a newspaper printed at Danville, in numbers nine, ten and eleven,
dated March 7, March 14, and March 21, 1808.  The plaintiff also
gave in evidence the record of the advertisement, and the clerk's
certificate, appended thereto, that the advertisement was received
and recorded April 30, 1808, and that at the same time the several
newspapers containing the same were presented and examined, and
that the advertisement was found to have been published in the
North Star, Vol. II, No. 9, dated March 7, 1808, No. 10, dated
March 17, 1808, and No. 11, dated March 21, 1808.  The plaintiff
also gave in evidence the record of the return of sales, and the list
of lands unredeeméd.  It appeared from the record, that the vendue
was held at the court house in Guildhall, in the county of Essex, on
the first Monday, being the fourth day, of April, 1808, and, by ad-
journment, on the fifth and sixth days of April, and that the whole
of each proprietor's share in Norton was sold,—fifty seven shares to
Justin Ely and two shares to Timothy Hinman; and in the sheriff's
certificate, appended thereto, it was stated, that "all the lots, tracts
and rights described in the foregoing record, or such part of them
as were requisite to discharge said tax and cost on each of such lots
and rights respectively" were sold to the *persons* named.  The
clerk's certificate showed, that this return was received and recorded
April 30, 1808.  To all which the defendant objected, but the ob-
jection was overruled by the court.  The plaintiff proved, that the
"North Star" was the newspaper, which most generally circulated
through the county of Essex in the years 1807 and 1808.  The
plaintiff also, in order to show a division and allotment of the town
of Norton, offered the deposition of Azarias Williams, with the ac-
companying documents, which was objected to by the defendant,
but admitted by the court.*  The plaintiff also gave in evidence a

---

* The competency and effect of this evidence not being decided upon by the
supreme court, no more particular statement of it is necessary.

deed to himself from Justin Ely, dated May 13, 1833, purporting to convey the entire township of Norton.

The plaintiff also offered in evidence the deposition of Thomas Ruiter, taken November 8, 1845, to be used upon the trial of this case before the county court; to which the defendant objected, for the reason that the place of holding the court was not stated in the caption; but the objection was overruled by the court.

The plaintiff also introduced evidence tending to prove, that the defendant, on the third day of November, 1842, gave to Thomas Ruiter and Freedom Rogers a written license to cut two hundred pine logs in the town of Norton; and that Ruiter and one Oliver Kinney did, in pursuance of said license, cut two hundred and forty four pine logs in said town and take them into Canada. The plaintiff also gave evidence tending to prove, that the defendant, in March, 1842, gave Kinney permission to cut a few pine trees, standing in the town of Norton, and that Kinney, in the summer of the same year, cut down the trees, and in the winter and spring following took away about forty logs, and sold them, and accounted to the plaintiff for about $11,00 therefor. The plaintiff also gave evidence tending to prove, that the plaintiff gave permission to Kinney to sell certain other logs, about one hundred in number, which had been previously cut in Norton, and that Kinney accordingly sold them to one Cleveland, and they were taken away. The plaintiff also gave evidence tending to prove, that, in addition to the written license above mentioned, the defendant gave permission to Kinney for him and Ruiter to cut all the logs, which they did cut, with an agreement that the defendant was to be paid for them.

The defendant gave in evidence a deed to himself from David McKim, dated September 2, 1834, and recorded November 27, 1834, which purported to convey the entire township of Norton, and gave evidence tending to prove, that in the summer of 1835 he procured a person to cut the trees on about five acres of land in Norton, claiming that he owned and was taking possession of the whole township; that in the autumn of the same year he caused the said five acres to be cleared, and erected a house, and put a tenant thereon; and that the defendant has ever since retained the possession, and has cleared in all about forty acres of land, and has occupied the same, by his agents, during the summer seasons, and some

part of the time has had a tenant residing there,—all this being for the mere purpose of keeping a possession, and the defendant ever claiming, that he was the owner of the whole township, and that he was in possession of the whole.

It was also proved, that Freedom Rogers died within a few days after November 3, 1842, and before any logs had been cut under the written license from the defendant, of that date, to Ruiter and Rogers. Kinney, who was introduced as a witness on the part of the plaintiff, testified, that he never saw any marked lot lines in the town of Norton, and never examined with that view; his opportunity for knowing any thing in regard to that, being confined to his going upon the land to cut the timber and remove it, as above named. The defendant also gave in evidence a copy of a deed from the plaintiff to Isaac Wardwell, Oliver Hale, Daniel Brown, Richard G. Bailey and Calvin Powers, dated July 6, 1835, purporting to convey all the interest, which he acquired in the town of Norton by virtue of his deed from Justin Ely. The defendant also gave evidence tending to prove, that the plaintiff had received $100,00 of Ruiter and Cleveland, under an agreement not to prosecute them for the logs which had been cut by permission of the defendant in Norton and had been carried by them into Canada, with the express understanding, that it was not to release the cause of action against the defendant, or against them,—that sum being less than the value of the logs, but being all he could obtain, without commencing a suit in Canada.

The plaintiff then gave in evidence a copy of a deed from Calvin Powers to Oliver Hale, David Brown, Richard G. Bailey and Isaac Wardwell, dated July 10, 1838 ; and also a deed from Oliver Hale, David Brown and Richard G. Bailey to the plaintiff, dated January 31, 1842 ; to which the defendant objected, but the objection was overruled by the court. The objections to the form of the latter deed are fully stated in the opinion delivered by the court.

The defendant requested the court to charge the jury, 1. That if the defendant entered into possession of the town of Norton in 1835, as above described, and had ever since remained in possession in the manner and making the claim, which his evidence tended to prove, his possession would extend to the entire town, and would be adverse to the plaintiff and all others claiming title to the town, and

that so all the deeds offered by the plaintiff, executed subsequent to the time when the defendant thus took possession of the town, were void.   2. That the possession thus taken and claimed would operate a disseisin of the plaintiff; and therefore the plaintiff could not maintain this action for logs taken from the town by permission of the defendant subsequent to the time when the defendant thus took possession.   3. That if the effect of the defendant's actual possession was to render him a tenant in common in the possession with the plaintiff, the plaintiff could not recover in this action.   4. That there was no legal evidence, tending to show a legal division of the town of Norton.   5. That there was no legal evidence, tending to show any such division in fact, made upon the land and acquiesced in by the proprietors.   6. That if the town was in fact divided and allotted upon the land, still the defendant's actual possession, taken and continued in the manner and with the claim which his evidence tended to prove, would be a constructive possession of the entire township, and the plaintiff was not entitled to recover.   7. That if the defendant's license to Kinney to cut the trees, from which the forty logs above mentioned were cut, was a mere license to cut the trees, it would only imply a license, at most, to cut the trees and carry the logs immediately away,—for which the plaintiff could only recover by an action of trespass *quare clausum fregit;* and that, if Kinney cut down the logs and allowed them to lie so long upon the ground, as to entitle the plaintiff to treat them as personal property and bring this action for taking them away, he could only sustain the action against Kinney, and could not hold the defendant liable in an action of trespass *de bonis asportatis.*   8. That the death of Freedom Rogers, prior to any logs having been cut under the written license to Rogers and Ruiter, operated as a revocation of that license, and Ruiter had no authority to proceed afterwards under that license, either alone, or in company with Kinney, and cut logs, and enable the plaintiff to hold the defendant responsible therefor.   9. That the license from the defendant to Kinney, to sell the one hundred logs, and the sale by Kinney to Cleveland, would not entitle the plaintiff to sustain this action against the defendant, for taking away those logs,—it not appearing, that the defendant had in fact ever received any pay therefor.   10. That the court should instruct the jury as to the fact, appearing upon the deeds, that the

plaintiff was, at the most, the owner of but four undivded fifth parts of said town ;—and upon this point the court neglected to give the jury any instructions, considering that, as to a mere stranger, it was indifferent.

But the court, upon the first point, charged the jury, that such would be the effect of the defendant's possession, unless the town had been surveyed and allotted and divided into severalty, in the manner testified in Williams' deposition, and that allotment and division acquiesced in, ever since it was made, by all the proprietors of the township ; but in that case the defendant's constructive possession would be limited to the lot, or lots, upon which he had entered and made a permanent possession upon some part of the same ; and in that case the plaintiff's deed of the other portions of the town would not be rendered void thereby. As to the second point,— that the disseisin of the plaintiff was not more extensive than the constructive possession of the defendant, and that, if they found the survey, allotment and division in the manner above stated, the plaintiff, being the owner of four fifths of the whole town, with the exception of one or two, or a very few, rights, could not be disseised by the entry of a mere stranger upon one lot, and the making of a permanent possession there, but that such a possession would only operate a disseisin as to that lot; and that for any acts committed in regard to timber which grew upon that lot, the defendant is not liable in this action ; and that, if there had been no allotment of the town by an actual survey, marked upon the land, then the defendant's possession *would* extend to the whole township, and the plaintiff cannot recover in this action. That the testimony in the case did not tend to show the defendant a tenant in common with the plaintiff, as to the title of any portion of the town, and certainly not as to the possession beyond those lots, upon which he had made some actual possession, and, as to this point, will not place the recovery in any different position from that already stated. That the testimony of Williams and the accompanying documents, with the other *testimony* above referred to, did tend to show a survey, allotment and division of the town, and such acquiescence therein, as would make it binding upon the proprietors,—explaining these several matters in a manner not excepted to by the defendant. That if the defendant gave license to others to cut timber upon lots, to

which he had no constructive possession, and expected it would be cut at one time and removed at another, (as the plaintiff gave testimony tending to show was the fact,) then the defendant would be liable to this action, the same as if he had done the acts himself, in the same manner,—otherwise, not in this form of action, if he expected, that his agents and those to whom he gave license would cut and carry away the timber at the same entry upon the land. That the death of Freedom Rogers would not technically operate a revocation of the license as to Ruiter, but would so, to any one claiming right by or through, or under Rogers; and that Kinney's right to cut timber could not rest upon the license to Rogers, but upon the parol permission attempted to be proved by the plaintiff. That in regard to Kinney's sale to Cleveland, of the one hundred logs already cut, if Cleveland was in any sense induced to remove them in consequence of this sale, when he otherwise might not have done so, and Kinney had permission from the defendant to make such a sale, then the defendant was also liable, to the extent of the value of those logs, deducting in this, as in every case, what the plaintiff had received of any one, by compromise with them, after the logs were removed into Canada, as attempted to be shown; but the court told the jury, that the testimony upon this point was not satisfactory, and recommended, that they should not include any damages in regard to those logs,—but that they could do as they thought the facts required, under the rule above laid down.

In regard to damages, the court instructed the jury, that the plaintiff, if he made out his case, in the manner above stated and attempted to be proved, should recover the value of the timber taken by the defendant and his agents, deducting what the plaintiff had received of Ruiter and Cleveland, and that the receiving of that sum from them, if taken in the manner above stated, would not otherwise affect this action.

The jury returned a verdict for the plaintiff. Exceptions by defendant.

*Washburn & Marsh*, for defendant, cited 1 Chit. Pl. 55; *Wilson v. Gamble*, 9 N. H. 74; *Pickering v. Pickering*, 11 N. H. 144; *Cutting v. Cox*, 19 Vt. 517; *Skinner v. McDaniels*, 5 Vt. 539; Tol. St. 268, § 2; Ib. 271, § 7; *Hall v. Collins*, 4 Vt. 316; Rev.

St. 497; *Riley* v. *Jameson*, 3 N. H. 27; Lit., sec. 417; *Beach* v. *Sutton*, 5 Vt. 209; *Crowell* v. *Bebee*, 10 Vt. 33; *Putney* v. *Day*, 6 N. H. 430.

*O. P. Chandler* and *Tracy & Converse*, for plaintiff, cited *Marvin et ux.* v. *Denison*, Circ. Ct. for the District of Vermont, May T. 1846; *Booge, Ex'r*, v. *Parsons*, 2 Vt. 456; 2 Tol. St. 292; *Bellows* v. *Elliott*, Essex Co. ; *Kimball* v. *Wilson*, 3 N. H. 96; *Adams* v. *Jackson*, 2 Aik. 145.

The opinion of the court was delivered by

HALL, J. The plaintiff's property in the logs depends upon his title to the land. His claim of title under the tax sale will be first considered.

The following principles, or rules, for testing the validity of tax titles, appear to be fairly deducible from the reported cases on that subject.

1. When the statute, under which the sale is made, directs a thing to be done, or prescribes the form, time and manner of doing any thing, such thing must be done, and in the form, time and manner prescribed, or the title is invalid; and in this respect the statute must be strictly, if not literally, complied with. *Spear* v. *Ditty*, 9 Vt. 282. *Bellows* v. *Elliott*, 12 Vt. 574. *Sumner* v. *Sherman*, 13 Vt. 612. *Carpenter* v. *Sawyer*, 17 Vt. 124.

2. But in determining what is required to be done the statute must receive a reasonable construction; and when no particular form or manner of doing a thing is pointed out, any mode, which effects the object with reasonable certainty, is sufficient; and in judging of these matters the court is to be governed by such rational rules of construction, as direct them in other cases. *Spear* v. *Ditty*, 8 Vt. 421. *Bellows* v. *Elliott*, 12 Vt. 574. *Isaacs* v. *Shattuck*, 12 Vt. 668.

The sale, by virtue of which the plaintiff claims, was made under the statute of November 11, 1807, assessing a tax of one cent on each acre of land in the state, for the purpose of defraying the expense of erecting a state's prison. 2 Tol. St. 267. Numerous objections are made to the validity of the plaintiff's title under this tax sale, which must be examined with reference to the provisions of the statute, under which the sale was made.

Chandler *v.* Spear.

1. The first objection made to the tax title is, that the treasurer's warrant is directed to the sheriff of the county of Essex, without designating him by name, and that throughout his whole proceedings he describes himself and signs his name as sheriff, and not as collector.

We think the fair intendment of the statute is, that the collection of the tax should be superadded to the other duties of the sheriff; otherwise bonds and an oath would have been required of him, as collector. A similar construction was put upon an act, assessing a tax for building a jail, in *Bellows* v. *Elliott,* 12 Vt. 569, where the first constable of the town was directed to collect the tax. It was held, that the land tax act, which required the collector to be sworn, did not apply,—the constable being a public officer. This decision *could have been* made upon no other ground, than that the officer collected the tax as first constable.

2. The second objection is, that the treasurer's warrant merely named the towns and gores, in which the sheriff is to collect the tax, without stating, that they were within his precincts, or in what county they were, or that they were unorganized towns, and without giving any reason, why the warrant was directed to the sheriff, rather than to the first constable. It is a sufficient answer to these objections to the treasurer's warrant, that nothing is shown to be wrong in it; and it having been issued by a public officer, under the provisions of the statute, he is to be presumed to have performed his duty, until the contrary appears. *Bank of U. S.* v. *Tucker et al.,* 7 Vt. 134.

3. It is next objected to the *record of the rate bill* in the county clerk's office, that it is not properly designated in its caption, the word *prison* being omitted in the recital of the title of the tax act, and that some of the rights are designated as three hundred and twenty acres, instead of three hundred and fifty, and that in the date of the sheriff's certificate of its being a true rate bill the day of the month, February 10th, only, (without stating the year,) is given.

The statute,—2 Tol. St. 269, sec. 6,—directs the sheriff to assess the tax upon the several proprietors of the town, but does not specify, that he shall make a rate bill. He is, however, directed in section sixteen to leave his tax bill with the county clerk, with his other papers and proceedings, for record, which sufficiently implies,

that he is to have a rate bill. Its form and requisites are, however, not prescribed; and we think all that can be required is, that it distinctly and clearly show the correct sums, which each proprietor is to pay, and for the non-payment of which his right, or a sufficient quantity of it to pay the tax, is to be sold. In *Brown* v. *Hutchinson*, 11 Vt. 574, where the sale had been under the statutes of 1787 and 1788, [2 Tol. St. 276, 277,] which did not in terms require a rate bill, it was held, that though a rate bill was necessary, to show the taxes which the collector was to collect, yet that any correct statement of the tax, received and acted upon by the collector, was sufficient, though not certified by the committee.

In this case the sheriff was to make his own tax bill; and the tax bill he caused to be recorded shows, that he assessed the right sums to the proper proprietors. The leaving of it by him for record is sufficient *prima facie* evidence, that it was the rate bill he acted upon; and that also distinctly appears by the record of his certificate upon it of the paid and unpaid taxes. The omission, therefore, of the word *prison* in the caption is immaterial, as the identity of the tax assessed in the rate bill with that described in the treasurer's warrant appears with entire certainty, notwithstanding the omission.

Nor do we conceive the error, in stating the quantity of land in a portion of the rights, to be important. The quantity of land in each right being equal, and the tax upon each right the same sum, the error would at once be discovered to be clerical, and no one could possibly be misled by it. If the quantity of land in the rights could be unequal, the objection might merit a different consideration. If the statute assessing the tax had required the particulars of the basis of the tax to be stated in the rate bill, it must doubtless have been strictly complied with. But the result is all that is necessary, to constitute a tax bill, and such result being, in the present bill, entirely correct, it should, we think, be held sufficient.

The omission of the year in the date of the sheriff's certificate upon the rate bill is unimportant, as the year is sufficiently certain from other parts of it. The sheriff's certificate upon the rate bill shows the tax to have been assessed under an act passed November 11, 1807, and that it was assessed previous to the sixth of April, 1808. The "February 10th" in the certificate could, therefore, have been no other, than in 1808. In *Bellows* v. *Elliott*, 12 Vt.

Chandler *v.* Spear.

569, where the collector, in his return of sales, stated his vendue to have been on a certain day in 1833, when it should have been 1834, it was held that the error was immaterial, as it appeared from other parts of his return, that it must have been in 1834. In that case there was a positive error of date ; in this there is a mere omission, which other parts of the paper clearly supply.

4. It is objected, that the clerk's certificate to the record of the rate bill states it to have been recorded April 30, 1807, and that it therefore fails to show, that it was recorded in thirty days from the ending of the sale,—the sale having ended the sixth of April, 1808. Tol. St. 275, § 16.

The statute directs the recording to be made in thirty days, but does not specify how the fact of recording shall be shown. The ordinary proof, in such cases, is the certificate of the recording officer upon the record ; but that has been held to be only *prima facie* evidence of the time of the recording. In *Morton* v. *Elwin*, 19 Vt. 77, it was held, that the certificate of a justice of the peace, of the time when an execution, levied upon land, was returned and recorded in his office, was but *prima facie* evidence of the true time, and that the true time might be shown by parol. And to the same effect is *Carpenter* v. *Sawyer*, 17 Vt. 121, in relation to the certificate of a town clerk of the recording of vendue proceedings. In *Richardson* v. *Dorr*, 5 Vt. 9, and *Sumner* v. *Sherman*, 13 Vt. 609, parol evidence of the fact of the recording of vendue tax proceedings was admitted and acted upon by the court.

From the evidence in this case a jury could not have found otherwise, than that the record was made April 30, 1808, within thirty days after the ending of the sale ; for ;—1. The certificate of the clerk, of April 30, 1807, is an impossible date, being before the passing of the act, and is evidently a clerical mistake. The record was therefore made on some other day. 2. The record of the warrant, which immediately precedes the rate bill on the record book, and of the sheriff's return of sales, which immediately follows it on the same book, are both certified as recorded April 30, 1808, —from which it may be fairly inferred, that the whole was recorded on that day. 3. The original rate bill is produced, upon which is the clerk's certificate of its being recorded April 30, 1808. From

all which it very clearly appears, that the record was made in due time.

5. The next objection is, that the advertisement is of a sale to be held at *Guildhall*, and not in the town where the land is situated.

There is nothing in the statute requiring the land in unorganized towns and gores to be sold in the towns or gores; and to hold that the sheriff must make such sales would be requiring of him an impossibility. The warrant, in this case, embraced eight towns and three gores; and if the sheriff could designate proper places in his advertisement for the sales in towns and gores, in which were probably no inhabitants, or buildings, it would be impossible for him to make the sales, because the act requires the sales to be made on the first Monday of April, at nine o'clock in the forenoon. The legislature could not have contemplated, that the sheriff should make sales in eleven different towns at the same hour of the same day. The court house of the county, where the sale was made, seems to have been the proper place.

6. It is next objected, that the advertisement of the collector is not properly recorded. 2 Tol. St. 268, sec. 5, 6, 16.

The act for the regulation of particular land taxes requires, not only that the advertisement should be recorded, but that the newspapers, in which it was published, should be left with the clerk, and a record made of the advertisement, and also of the title, volume, number and date of the several papers, in which the publication was made. The object of the legislature being, that the record should not only show the form and date of the advertisement, but also the fact of its due publication. The latter object does not seem to have been contemplated by the act in the present case. It merely directs the advertisement to be recorded, and leaves the proof of its having been posted up in the towns by the constable, and of its publication by the sheriff, to be made by other evidence, than that of the record. The certificate of the clerk, in this case, shows a proper recording of the advertisement, and if it fails to show, that it was properly published, it is immaterial, as the statute did not require that to be done. The due publication of the advertisement was shown, in this case, by the production of the original newspapers.

7. It is farther objected, that the record does not show, that the reason for the sale of the whole of each right was, that no person would pay the tax for less than the whole. Tol. St. 270, sec. 6. The sheriff's return states, that he sold the rights, " or such parts of them as were requisite to discharge the tax and costs on each of the rights,"—which, we think, is sufficient.

8. Another objection made to the regularity of the tax proceedings is the absence of proof, that the secretary of state, immediately after the adjournment of the legislature in 1807, published the act in all the newspapers in the state, as directed in the seventeenth section.

It could not have been the intention of the legislature, that the act should become wholly inoperative and void, by the failure of a single newspaper to publish it. This provision must have been understood to be merely directory to the secretary, and not essential to the validity of the tax. In *Bellows* v. *Elliott*, in Essex County, in 1841, it appears by the record furnished us to have been held, that the publication of an act assessing a tax on the lands in the county for building a jail, by the treasurer of the county, was not essential to the validity of the sale, although the act directed such publication. See, also, *Bellows* v. *Elliott*, 12 Vt. 569. That being a local act, its publication would seem to be more necessary than in the present case. It is not shown, that the act was not duly published by the secretary of state; and if its publication were essential, the presumption would be, that the secretary had performed his duty.

These comprise all the objections taken to the validity of the tax title, and, being of opinion that neither of them is well founded, we must hold that title to be good. This result in regard to the tax title renders any examination of the plaintiff's title to a lesser quantity of the land, under the original proprietors of the town, unnecessary.

It is, however, insisted, in behalf of the defendant, that the plaintiff is precluded from deriving any benefit in this suit from his tax title, for the reason that he had parted with it by his conveyance to Wardwell and others in 1835, and had not regained it at the time of the trespass complained of; that the charge of the county court, in regard to the effect of the defendant's possession upon the recon-

Chandler *v.* Spear.

veyance to the plaintiff in January, 1842, was erroneous; that the defendant's actual possession of five acres, with a claim of title to the whole township, gave him the constructive possession of the whole township, which constructive possession would not be limited, as charged by the court, by the fact of an actual division of the town and an allotment marked upon the land; that the court also erred, in charging the jury that there was any evidence in the case, which had a tendency to show such division and allotment of the town; and that the charge of the court ought to have been, that, upon the facts shown, the deed of reconveyance was inoperative and void, under the statute, by reason of the defendant's adverse possession to the grantors at the time of its execution.

In the view which we have taken of the case, it becomes unnecessary to inquire, whether or not there was any evidence tending to prove a division of the town and an allotment of it marked upon the land, inasmuch as we think, that, conceding there had been no division of the town, the charge was quite as favorable to the defendant, as he was legally entitled to claim.

The question on this part of the case is, whether, giving full effect to the facts shown by the defendant, he was to be considered as having been in adverse possession of the whole township in 1842, so as to render the deed void, by which the land was then reconveyed to the plaintiff.

The term *constructive possession*, as applicable to real estate, is scarcely to be found in the English books; though the doctrine constitutes an important branch of American law.   It is indeed peculiar to the condition of things in a new country, where an important business of the inhabitants is the reduction of forest land to a state of cultivation.   When the settler enters upon a lot of wild land, it is impracticable for him at once to inclose it with that unequivocal mark of possession, a substantial and permanent fence. It is of no advantage to the land, and a useless expense for him, to do so.  He commences by clearing a part and erecting a dwelling upon it, and gradually extends his improvements, making such inclosures only, as may from time to time be necessary for the protection of his crops.  The residue of the lot is suffered to lie open, with either nothing, or at most with but lines of spotted trees, to mark its boundaries.  The law of constructive possession declares,

Chandler *v.* Spear.

that the deed of the lot to the settler, which may be found on record, and which describes with precision the boundaries of the land that he purchased, shall, so far as his title is concerned, be a substitute for a substantial and permanent fence around the whole; that his possession of the lot, though actual but for a part, shall, by force of his claim under the deed, be constructive for the residue.

This doctrine, when applied to a tract of land of suitable size for purposes of individual cultivation and improvement, seems justified and demanded by the wants and interests of a people in a new country; and to tracts of such limited dimensions the doctrine has been usually, if not always, applied in this state. This is the first instance, that we are aware of, in which an attempt has been made, by means of clearing a few acres within the limits of an uncultivated township of some twenty thousand acres, to extend the possession, by construction, over the whole territory. It is obvious, that the reason, on which the doctrine of constructive possession is founded, ceases in such a case. Such an application of it is not required for the protection of *bona fide* settlers. No individual can ever want such an extensive tract of land for purposes of actual cultivation. The idea of inclosing such a tract with a permanent and substantial fence is too absurd to be gravely stated; and the descriptive boundaries of it, in a deed, could therefore never be a substitute for such an inclosure. It would also be unjust to the real owners of the several rights of land in a township, to allow them to be deprived of their title by an intrusion for a period of fifteen years upon a few acres in an obscure corner of the town, which intrusion might be either unknown to them, or not deemed of sufficient importance to deserve serious attention.

It was held by the supreme court of the state of New York, in *Jackson* v. *Woodruff*, 1 Cow. 276, that the doctrine of constructive possession did not apply in a case, where there had been an improvement of only two acres in a tract of seven hundred and eighty three acres, and that it was only applicable to such tracts, as were purchased for the purpose of actual cultivation; and the doctrine of that case has been recognized and acted upon in many subsequent cases in that state, and is the settled law of the state. See *Jackson* v. *Vermelyea*, 6 Cow. 677; *Jackson* v. *Richards*, 6 Cow. 617; *Jackson* v. *Oltz*, 8 Wend. 440; and *Sharp* v. *Brandon*, 15 Ib. 597.

Chandler *v.* Spear.

It is doubtless impracticable to specify any precise quantity of land, that ought to be considered so far appendant to an actual improvement, as to be the proper subject of a constructive possession. The quantity might probably be varied by the nature of the business of the occupant, his apparent means of using and improving the land, and perhaps by the character and extent of his actual possession, and by other circumstances. It is not intended to say, that any quantity of land, which may reasonably be supposed to have been purchased and entered upon for purposes of cultivation and for use as a wood or timber lot, might not be protected by such a possession.

But the claim in the present case is altogether without the boundaries of any reasonable limit. The quantity of the land is not only too extravagantly large, to be the possible subject of individual cultivation, or use, but the defendant's own evidence tended to prove, not that he had entered upon the land in good faith, for the ordinary purpose of settling upon it, but that all his acts upon the land had been done, in the language of the bill of exceptions, " for the mere purpose of keeping a possession." To hold that such acts upon a few acres of land should extend themselves over a whole township, to the exclusion of the title of the true owners, would be giving an effect to the doctrine of constructive possession heretofore unknown in this state,—an effect, which is as unnecessary to the protection of the rights of the actual occupant of land, as it would be unjust to the rightful owners. We have no hesitation in saying, that the defendant, in this case, is not entitled to any benefit from the doctrine of constructive possession, and that his possession must be limited to the boundaries of his actual improvement.

The logs, for which the action was brought, having been taken from other land in the township of Norton than that covered by the defendant's clearing, it would follow, that, upon the case, as thus far examined, there is no ground for disturbing the verdict.

There are, however, several other exceptions to the ruling of the county court, which remain to be considered.

It is objected, that the charge of the court in regard to that portion of the logs taken by Ruiter was erroneous, for the reason that the defendant's license should be treated as having been revoked by the death of Rogers. The evidence tended to show, that the logs

were actually taken by Ruiter under and by virtue of his license from the defendant, and without any indication from the defendant of a disposition to treat the license as revoked. Under these circumstances we think the court was right in charging the jury, that the death of Rogers would not, as matter of law, excuse the defendant from liability. Under the charge of the court the jury must have found, that the logs were in point of fact taken by Ruiter under the counsel and advice of the defendant, which was sufficient to justify them in making him liable as a trespasser for Ruiter's acts in taking them.

The objection taken to the deposition of Thomas Ruiter, that the *place* of the holding of the court was omitted in the certificate, was, we think, properly overruled. In *Keith* v. *Day*, 15 Vt. 658, it was held, that a deposition was admissible, though the *time* of the session of the court was omitted, the time of the session being fixed by a public statute. The place of the session of the court is equally fixed by public statute, and we do not perceive, why that case must not be an authority for the admission of the deposition in this.

It is objected to the deed of reconveyance to the plaintiff of Hale, Brown and Bailey, that it is not sufficiently acknowledged by Bailey, to convey his rights. In the body of the deed one of the grantors is described as Richard G. Bailey, and it is signed and sealed R. G. Bailey. The acknowledgment, after a proper designation of the state, county and town, reads thus,—" this thirty first day of January, A. D. 1842, Oliver Hale and Daniel Brown, Richard G. personally appeared and acknowledged this instrument, by them *sealed and subscribed*, to be their free act and deed," &c. Although the name " Bailey " is omitted in the acknowledgment, yet the statement, that Richard G., who executed the instrument, acknowledged it, does, we think, render it sufficiently certain, that it was acknowledged by Richard G. Bailey, the grantor.

The only remaining objection to the verdict is one, which we have been unable to overcome.

The plaintiff's testimony did not tend to show a sole and exclusive title in himself to the logs sued for, but only an undivided share in them, as tenant in common. The court were requested to charge the jury, that the plaintiff's damages should be estimated according to the value of his undivided portion. But the court de-

---

---

clined so to charge, and it is to be taken, that the verdict was for the full value of the logs, as if the plaintiff were the sole owner.

It has indeed been long settled in this state, that one tenant in common, as against a stranger to the title, may recover the whole land in ejectment. In that action the thing itself is recovered, and the recovery of the whole is allowed, because it would be unjust to the plaintiff, to be compelled to accept a trespasser upon his rights and upon the rights of all the other owners of the land as his co-tenant. In such case the plaintiff is put in possession and holds both for himself and for the other co-tenants, whoever they may be. *Pomroy* v. *Mills,* 3 Vt. 279, 410.    *Univ. of Vt.* v. *Reynolds,* 3 Vt. 553.   *Johnson* v. *Tilden,* 5 Vt. 426.   *House* v. *Fuller,* 12 Vt. 172.

But where the action is for a trespass to personal property, the remedy being in damages only, there does not appear to be the like reason for allowing a full recovery by a part owner.   Indeed, all that a party can with any show of reason claim against one, who has trespassed upon a chattel in which he has an interest, is to be made good for the injury done to that interest.   It accordingly appears to be the well settled doctrine of the common law, that although the non-joinder of a part owner of a chattel may, in actions *ex delicto,* be pleaded in abatement, yet that if the defendant neglects to make such plea, he may still avail himself of a want of title to the whole in the plaintiff, for the purpose of reducing the damages.   And when one part owner has recovered for his share of the injury, the other has afterwards been allowed to sustain an action for his.   *Addison* v. *Overend,* 6 T. R. 766.   *Sedgworth* v. *Overend et al.,* 7 T. R. 279.   *Bloxam et al.,* v. *Hubbard,* 5 East 407.   Gould's Pl. 276. Chit. Pl. 55.

For this reason we think we must hold the judgment of the county court to be erroneous.

We have considered the question whether it is necessary to send the case back to the county court for a new trial and are of opinion that it is not.   Whenever a judgment of the county court has been found to be erroneous and it could be ascertained by computation what the judgment ought to have been, it appears to have been the practice of this court to make the correction without sending the case back for a new trial.   Thus it was said by Judge HUTCHINSON in *Sutton* v. *Burnett,* 1 Aik. 209, that if the judge should charge

the jury wrong in relation to the allowance of a particular item of claim, which was liquidated and certain, the court would not for that reason send the case back, but would order the sum erroneously allowed to be deducted from the verdict. And in *Paris* v. *Vail et al.*, 18 Vt. 284–6, the verdict of the jury in an action of trover was ordered to be set aside for all above the sum of $1000 and interest thereon from a certain date, and the judgment on the verdict affirmed for that sum.

There is no difficulty in ascertaining by computation what the plaintiff's proportionate share of the whole damages would be, and we think the plaintiff should have judgment for that sum.

The plaintiff's vendue title, which we have found to be valid, originally embraced fifty seven of the sixty five rights in the township. These rights he conveyed away in 1835; and regained but three undivided fourth parts in each of them, by the re-conveyance to him in 1842. He is therefore entitled to three fourths of fifty seven sixty fifths of the whole damages, the $100 received of Ruiter and Cleveland to be wholly deducted from the plaintiff's portion of the damages. Upon this computation we find the damages, which are now $289, should be reduced to $155,85, for which judgment is to be entered on the verdict for the plaintiff.

Judgment reversed for the excess above $155,85, and affirmed for that sum.