CUSHING v. MILLER & a.

A tenant in common in possession may, in a case where equity has jurisdiction, maintain a bill against the owner of adjoining lands to establish the boundaries.

An objection to the form of the remedy is generally waived if not taken at or before the trial of the merits.

BILL IN EQUITY, to establish boundaries.   Facts found by a referee.

| 62 | 517 |
| 68 | 439 |
| 62 | 517 |
| 69 | 474 |
| 69 | 570 |
| 62 | 517 |
| 72 | 131 |
| 72 | 132 |
| 62 | 517 |
| 74 | 159 |

The town of Eaton was chartered November 10, 1766, and was bounded on the south by " Fletcher's curve line." Prior to or during 1774 the Masonian proprietors, owning a large territory of unbroken forest land in this county, caused to be surveyed and located out of it, by their surveyor, James Hersey, one hundred and seventeen 100-acre lots, which were subsequently known by number as

lots in " the Ossipee ranges." The northerly and triangular portion of lot 100, comprising about forty acres, fell within the part of the then town of Eaton which is now Madison. Effingham was incorporated in 1778, and in the part of it which is now Freedom was included the easterly and greater portion of the remainder of

the lot. Ossipee, incorporated in 1785, includes the residue of the lot. The south division of the town of Eaton adjacent to and northerly of these lots was surveyed and divided into 100-acre lots by James Hersey in 1781. He excluded from his survey the portion of lot 100 which lay in Eaton, leaving, in place of what would otherwise have constituted 100-acre lot No. 184 in the south division of lots in Eaton, an irregular K-shaped tract comprising about sixty acres, to which he gave no number. He assigned No. 184 to a long, irregular lot lying westerly of and adjacent to that tract, and to lots 183, 182, and 181. The preceding sketch shows the location of lot 100 in relation to the town lines and other lots.

The controversy is in regard to the part of lot 100, which lies in Madison; and one of the questions is, whether the plaintiff or the defendants have the better title to that tract.

In 1796 the Masonian proprietors, by vote at a legal meeting, and by lot, made partition among themselves of the 117 lots in the Ossipee ranges. Lot 100 was drawn to the right of —— Solley and Clement March. In support of his title the plaintiff produced the following duly recorded deeds:

1. Quitclaim. Clement March to Isaac Lord and Jonathan Moulton, dated November 2, 1806, of (among other lots) "lot 100 in the town of Ossipee and Ossipee Gore, all of said lots being 100-acre lots drawn to the original right of Solley and March, my right being one half of all said lots in common and undivided with the heirs of Solley."

2. Quitclaim. Jonathan Moulton to Isaac Lord, dated November 10, 1807, not acknowledged, of "all right and title in lot 100 in the town of Ossipee . . . drawn to the right of Solley and March, being the same lands deeded to said Lord and myself by Clement March, by his deed dated November 22. 1806."

3. Warranty. Isaac Lord to Ellis B. Usher, Abijah Usher, Jr., and John Lane, dated March 14, 1832, conveying "to said Ellis B. Usher one half and to Abijah Usher, Jr., and John Lane one half . . . of lot No. 100 in what is called the Ossipee ranges in . . . Effingham," and of other lots.

4. Quitclaim. John Lane and Abijah Usher, Jr., to Ellis B. Usher, dated April 5, 1834, of "all the right, title, and interest in and to about 6,000 acres of land in . . . Freedom and Effingham, which we said John, Abijah, and Ellis B. Usher purchased of Isaac Lord, as his deed dated March 14, 1832, will more fully show."

5. Warranty. Ellis B. Usher to Amos Towle, Jr., dated May 30, 1837, of "seven sixteenths of half of Lot No. 100 in the Ossipee ranges, so called, in said Freedom."

6. Warranty. Ellis B. Usher to John Kennett, dated May 30, 1837, of "five sixteenth parts of half of lot No. 100 in the Ossipee ranges, so called, in said town of Freedom."

7. Warranty. Ellis B. Usher to Amos Towle, Jr., dated Decem-

ber 5, 1845, of " four sixteenth parts of half of lot No. 100 in the
Ossipee ranges, so called, in said town of Freedom."

8. Warranty. Amos Towle to James O. A. Harmon, dated
May 27, 1857, of " one half of . . . half of 100 . . . in the
Ossipee ranges, so called . . . being part of land I bought of
Ellis B. Usher by his deed dated May 13, 1837."

9. Warranty. John Kennett to James O. A. Harmon, dated
November 10, 1857, of " half of 100 in Ossipee ranges, so called,
. . . deeded to me by Ellis B. Usher by his deed dated May
30, 1857."

10. Quitclaim. James O. A. Harmon to the plaintiff, dated
April 1, 1866, of " one half of lot numbered 100 in the Ossipee
ranges, so called, and for a more particular description reference
is had to deeds Amos Towle and John Kennett to James O. A.
Harmon."

11. Wentworth Lord, collector of taxes in Ossipee, to Ichabod
Hodson, dated March 26, 1814, of " one lot of land in Ossipee
aforesaid, viz., lot No. 100, a hundred acre lot . . . sold to said
Hodson at my vendue . . . Monday, Feby 1, 1813."

12. Warranty. Ichabod Hodson to John Mathes, Jr., dated
December 14, 1822, of " the hundred acre lot in Ossipee aforesaid
numbered 100, to have the whole of said lot No. 100, be the same
more or less."

13. Warranty. John Mathes, Jr., to Ellis B. Usher, dated August 12, 1823, of " a certain lot of land in the town of Ossipee
aforesaid numbered 100, and is the same lot of land I purchased
of Ichabod Hodson."

14. Quitclaim. Ellis B. Usher to Jonathan Tucker, dated August 30, 1823, of " all right, title, and interest in and to one half
the lots of land situate in the town of Ossipee, being numbered 63
and 100."

15. Record in bankruptcy, showing that Jonathan Tucker was
declared a bankrupt June 21, 1842; that Nathaniel Mitchell was
appointed assignee July 4, 1842; that lots numbered 63, 65, 69;
and 100 in the hundred acre ranges in Ossipee were included in
the bankrupt's schedule of assets.

16. Quitclaim. Nathaniel Mitchell, assignee in bankruptcy of
Jonathan Tucker, to Stephen H. Berry, dated June 17, 1844, of
" all the right, title, interest, estate, claim, and demand which the
said Nathaniel Mitchell, in his capacity as assignee . . . had in
and to a certain tract of land situated and lying in Ossipee in the
county of Carroll, described as follows, viz., Four lots of land in
said Ossipee numbered 63, 65, 69, and 100 in the three hundred
acre range, and supposed to contain in all three hundred acres.
For a more particular description, reference is made to the two
deeds of Ellis B. Usher and Roger Welch, dated August 14 and
30, 1823."

17. Quitclaim. Stephen H. Berry to Charles W. McKenney,

dated November 14, 1863, of "all my right, title, and interest in and to lots numbered 69 and 100 in the three hundred acre range of lots lying in the town of Ossipee . . . which I acquired by virtue of a deed . . . from Nathaniel Mitchell . . . as assignee of the estate of Jonathan Tucker . . . dated June 17, 1844, reference to which is here had."

18. Quitclaim. Charles W. McKenney to Orestes R. Topliff and Josiah P. Cushing (the plaintiff), dated Dec. 29, 1863, of "the following described lot, situate in Ossipee in said county, being lot numbered 100 in the three hundred acre range of lots in said Ossipee . . . meaning and intending to convey all the right, title, and interest in said lot numbered 100 that was conveyed to me by Stephen H. Berry by deed dated Nov. 14, 1863, and nothing else."

19. Warranty. Calvin Topliff, administrator of Orestes R. Topliff, to the plaintiff, dated June 16, 1866, of "all the right and interest of said deceased at the time of his death in . . . lot numbered 100 in the three hundred acre range of lots in said Ossipee . . . meaning hereby to convey to said Cushing all the right, title, and interest the said Orestes R. Topliff had in said lot, whether situated in said Ossipee or Madison."

Except the lot in question, there was and is no lot numbered 100 situated wholly or partly in Ossipee, or partly in either Madison or Freedom. The plaintiff proved that in 1826 Ellis B. Usher, under a claim of title, worked at lumbering on the part of lot 100 lying in what was then Eaton, and is now Madison. It was then understood that the lot was owned by him and Jonathan Tucker in common. In 1829 or 1830, Jonathan Tucker cut timber from that part of the lot which lies in Ossipee. In 1850, Amos Towle, under a claim of title, entered upon and cut growth on the part of the lot now in Madison. In 1864 the plaintiff and Orestes R. Topliff cut timber from the same part of the lot under a claim of ownership, and in 1865, while the defendants' servants were cutting the growth thereon, the plaintiff pointed out to them the line as he then claimed and now claims it to be, and ordered them to desist from cutting.

In support of their claim of title to the premises, the defendants produced a copy of an original plan of Eaton and Madison, made by Sylvanus S. Clark, and found at the selectmen's office in Madison, among the records of the town. Clark was an experienced and reputable surveyor, now deceased. On this plan, no part of lot 100 is delineated. The K-shaped tract and the part of lot 100 in Madison, according to Hersey's survey and plan, are laid down as together constituting a full rectangular 100-acre lot, which is numbered 184. The lot numbered 184 by Hersey bears on this plan the same number, and is marked in addition " Long Lot." It extends northerly about 100 rods farther than it does on Hersey's plan, and contains about 140 acres. Madison was

incorporated Dec. 17, 1852. The defendants produced the following deeds:

20. Daniel Lary, collector of taxes in Eaton, to Richard Lary, dated February 12, 1816, of "lot 184 in the south division of Eaton," together with record proof that in March, 1814, Daniel Lary was duly elected collector of taxes for the town of Eaton, and that February 10, 1815, he sold the lot to Richard Lary for non-payment of taxes.

21. Warranty. Richard Lary to Isaac Davis, dated July 29, 1816, of "a certain parcel of land in the south-west corner of Eaton, beginning at the south-east corner of lot No. 183 in the south division in said Eaton; thence running westwardly to Tamworth line; thence on said Tamworth line southwardly to the corner of the town; thence eastwardly on the curve line until a parallel line will strike the first mentioned bound, to contain one hundred acres, more or less."

22. Warranty. Richard Lary to Mary Clark, dated November 12, 1817, of "eighty acres out of lot No. 184, south division, said lots according to Hersey's survey of said town of Eaton."

23. Quitclaim. Richard Lary to Mary Clark, dated December 2, 1817, of "eighty acres out of the north part of lot numbered 184 in the south division in said Eaton."

24. Warranty. Isaac Davis to Thomas Randall, dated November 20, 1821, of the same land by the same description as in the above named deed (No. 21) Lary to Davis.

25. Warranty. Thomas Randall to Jonathan Tucker, dated August 21, 1823, of "all the lands . . . I own in the town of Eaton, viz.: . . . No. 186 and 187 and 183 and 184 . . . meaning hereby to convey my right to the above lands . . . which is three eighths of all the above named in common and undivided between Ellis B. Usher and Robert Page."

26. Quitclaim. Jonathan Tucker to Ellis B. Usher, dated August 30, 1823, of three sixteenth parts of "lots 183 and 184, situated in the town of Eaton."

27. Quitclaim. Mary Clark to John March, dated June 7, 1824, of "a parcel of land in said Eaton, it being 80 acres of the northerly part of said lot numbered 184, in the south division of said lots, the whole to contain 180 acres, according to Hersey's survey."

28. Warranty. John March to Jonathan Tucker and Ellis B. Usher, dated November 5, 1825, of "lot numbered 184 in the south division of lots in said Eaton, and being all of said lot excepting that part owned by said Tucker and Usher."

29. Warranty. Jonathan Tucker to Gideon Tucker, dated February 15, 1842, of "lot numbered 184, in Eaton."

30. Warranty. Gideon Tucker to Nathaniel J. Miller (one of the defendants), dated November 24, 1845, of "lot 184, in the south division of lots in said town of Eaton."

31. A bond of said Miller to Joseph Hobson (the other defendant), dated October 10, 1865, to convey to the latter said lot 184, upon the performance of certain conditions.

Between the years 1837 and 1842, Jonathan Tucker, by his agent, under a claim of ownership, cut timber from lot 184 up to the Madison line; and, under the agent's supervision, timber for building and repairing a bridge was taken from the lot for years, and Tucker was paid for the same by the town. The selectmen, and others interested in lands in Madison, were accustomed to speak of 184 square lot and 184 long lot, and they were taxed under the general denomination of 184 to Jonathan Tucker, and called together 150 acres.

The defendants proved that John Kennett never claimed to own land in Madison; that when Amos Towle deeded to Harmon, the town line was pointed out to Harmon as the boundary, by Towle's agent, employed for that purpose; that Harmon, while he owned lot 100, made no claim to ownership beyond the town line, and specially instructed his servants cutting timber thereon to cut only to Madison town line; that he refused to execute a deed to the plaintiff, which the latter prepared, quitclaiming "lot numbered 100 in the 300-hundred acre ranges, so called, in Ossipee, or wherever situated," but in place of it executed to the plaintiff the deed above mentioned in the plaintiff's chain of title (No. 10).

The spotted trees and other monuments marking the town line between Madison on the one side and Ossipee and Freedom on the other, have not been removed or disturbed. The line has been perambulated several times, and there is no difficulty in tracing it by fixed monuments. The defendants, by their agents and servants, have cut off the standing growth, and many of the trees marked as line trees of that part of lot 100, which, as originally located, lies in Madison, rendering it difficult to trace the lines by means of monuments. Some spotted trees, however, are still in existence, by means of which the lines can still be found, though with great difficulty. The difficulty is to some extent due to the existence in the neighboring forest of numerous lines of spotted trees made by lumbermen for the purpose of marking the limits of lots let for cutting and logging jobs.

At the June term, 1881, it was held that the plaintiff was entitled to a decree. The defendants move for a rehearing upon the grounds (1) that they show the better title to the land in dispute, and (2) that equity has no jurisdiction.

*T. J. Whipple, J. G. Hall,* and *E. A. Hibbard,* for the plaintiff.

*F. Hobbs, J. H. Hobbs,* and *W. J. Copeland,* for the defendants.

CARPENTER, J. The referee finds that the entire tract surveyed and divided into 117 lots by Hersey in 1774 is within the

limits of the Masonian grant.　For the purposes of the case, therefore, a good title in the proprietors to lot 100, including the part of it situated in the town of Eaton, must be taken as an established fact, whatever may be the historical or other evidence regarding the extent of their claim or the boundaries of the grant as finally settled.　By the partition made by vote of the proprietors in 1796, Solley and March took a valid title in severalty to lot 100.　*Cornish* v. *Kenrick*, Smith N. H. 270, 274; *Coburn* v. *Ellenwood*, 4 N. H. 99; *Atkinson* v. *Bemis*, 11 N. H. 44; *Little* v. *Downing*, 37 N. H. 355.　By virtue of the conveyances, numbered 1 to 10 inclusive, the plaintiff shows a clear title to thirteen sixteenths of one half the lot in common with the heirs of Amos Towle owning three sixteenths of one half, and the heirs of Solley owning the other one half.　The land conveyed by these several deeds is described as a fractional part of "lot numbered 100 drawn to the right of Solley and March," or as "lot numbered 100 in the Ossipee ranges."　By either description the entire lot is designated as explicitly as it well can be.　It was situated in an unbroken forest.　It was known by number only, but as definitely and certainly by its number as one's homestead is known by that name. The statement that the lot was situated in Ossipee, Effingham, or Freedom was designed not to restrict the operation of the deed to the part of it lying in the town named, but to point out by way of additional description its supposed geographical location.　It is as if one should convey his farm, lying partly in each of three towns, describing it as his homestead farm, and also as situated in one of them.　The statement of the location, so far as it is inconsistent with the previous description, must be rejected as mistaken.　If the land intended to be conveyed is sufficiently ascertained, it will pass, although its description is in some particulars erroneous. *Greely* v. *Steele*, 2 N. H. 284; *Lyman* v. *Loomis*, 5 N. H. 408; *Drew* v. *Drew*, 28 N. H. 489; *Holbrook* v. *Bowman*, 62 N. H. 313.

The defendants do not claim under Moulton, and it is immaterial that his deed to Lord (No. 2) was not acknowledged.　*Montgomery* v. *Dorion*, 6 N. H. 250; *Stevens* v. *Morse*, 47 N. H. 532.

The plaintiff's title is not affected by the declarations of Towle, Kennett, and Harmon, that they claimed to own no land in Madison. Upon the questions of the character and extent of their possession and the boundaries of the lot, the declarations might be competent evidence, but they are not admissible to control or affect the legal construction of the deeds.　*Claremont* v. *Carlton*, 2 N. H. 369, 372.　There is no estoppel.　No action was taken by reason of the declarations.　The declarants' mistaken statements, that they had or claimed no title to land in Madison, would not preclude them or their grantees from afterwards asserting their title to its full extent against any one who had not acted on the faith of them.　*Parker* v. *Brown*, 15 N. H. 176.

The plaintiff derives his title from the sovereign, and need not

show actual possession in himself or in any one under whom he claims.   *Graves* v. *Amoskeag Co.*, 44 N. H. 462.

The defendants do not claim under the Masonian proprietors, but under the deed (No. 20) of Lary, collector of taxes to Richard Lary.   Nothing passed by this deed.   A compliance with the requirements of the statutes under which the sale, for taxes was made is not shown, and, in the absence of evidence that the town records have been lost or destroyed, cannot be presumed.   *Brunswick* v. *McKean*, 4 Me. 508, 510; *Hathaway* v. *Clark*, 5 Pick. 490; *Waldron* v. *Tuttle*, 3 N. H. 340, 344; *Cahoon* v. *Coe*, 57 N. H. 556.

Assuming that the land in dispute would pass under a conveyance of lot 184 in Madison, the several deeds in the defendants' chain had no operation except to give the grantees a color of title. But the only value or effect of color of title is to extend by construction an actual possession of a part of the land covered by the apparent title to the whole.   Mere color of title in the absence of possession under it is worthless for any purpose.   It confers no right against a mere wrong-doer.   It is not the deed, but the possession under it, which gives the title.   *Minot* v. *Brooks*, 16 N. H. 374, 377; *Hoag* v. *Wallace*, 28 N. H. 547; *Graves* v. *Amoskeag Co.*, 44 N. H. 462; *Wells* v. *Iron Company*, 48 N. H. 491; *Bell* v. *Peabody*, 63 N. H. 233.

Possession for any time, however short, is sufficient evidence of title against one who shows no better right.   But to establish against the owner a title by possession, an open, visible, continuous, and exclusive adverse possession for the period of twenty years must be shown.   *Little* v. *Downing*, 37 N. H. 356.   A possession of this character in the defendants, or in those from whom they derive their title, is not shown, or, indeed, claimed.   The occasional cutting of a few timber trees on a wild lot, or such acts of ownership as were exercised by Jonathan Tucker, however long continued, do not alone constitute the visible, continuous, and exclusive occupation necessary to give title by possession.   *Hale* v. *Glidden*, 10 N. H. 397, 402; *Bailey* v. *Carleton*, 12 N. H. 16, 17; *Moore* v. *Hodgdon*, 18 N. H. 144.   During all the period of Tucker's cutting, the owners of the title derived from the state were by legal intendment in possession.   They were not in fact ousted or excluded from the possession.   There was no actual disseizin. *Towle* v. *Ayer*, 8 N. H. 57, 60.   Tucker's acts were mere trespasses.   It is not material that for the sake of the remedy the owners might have elected to treat them as a disseizin.   *Towle* v. *Ayer*, 8 N. H. 61, 62.

As against a stranger, or one who has no right, a tenant in common of lands or chattels is entitled to the possession, not merely of the undivided part to which he makes a title, but to the whole. *D' Wolf* v. *Harris*, 4 Mason 515, 539; *Hardy* v. *Johnson*, 1 Wall. 371, 373.   For this reason it is held in several jurisdictions that

in ejectment a tenant in common may recover the entire property from one who shows no title. *Coit* v. *Wells*, 2 Vt. 318; *Chandler* v. *Spear*, 22 Vt. 388; *Robinson* v. *Johnson*, 36 Vt. 74; *Smith* v. *Starkweather*, 5 Day 210; *Barrett* v. *French*, 1 Conn. 364; *Cross* v. *Robinson*, 21 Conn. 386; *Robinson* v. *Roberts*, 31 Conn. 145; *Collier* v. *Corbett*, 15 Cal. 183; *Touchard* v. *Crow*, 20 Cal. 150, 162; *Hardy* v. *Johnson*, 1 Wall. 372; *King* v. *Bullock*, 9 Dana 41; *Rabe* v. *Fyler*, 10 S. & M. 440; *Sharon* v. *Davidson*, 4 Nev. 416. So, also, in replevin. *Sprague* v. *Clark*, 41 Vt. 6; *Cox* v. *Fay*, 54 Vt. 446; *Chaffee* v. *Harrington*, 60 Vt. 718. It is not necessary to inquire whether such is the law of this state. The bill is not brought to obtain possession of the land. It alleges seizin and possession in the plaintiff, and prays that the boundaries may be established. The defendants by their answers deny the plaintiff's seizin and possession, and say that the defendant Miller is and long has been the owner of the land; but they show in him no title, no actual possession, and no right to the possession as against either the plaintiff or his co-tenants. The plaintiff establishes a legal title to an undivided part, possession, and, as against the defendants, the right to the possession of the whole. This is sufficient, so far as title is concerned, to enable the plaintiff to maintain the bill.

This result renders it unnecessary to determine whether lot 100, or any portion of it, would pass under the description contained in the deeds numbered 11 to 31.

The bill was filed December 3, 1867. It assumes that there is no controversy between the parties respecting the title to the land. It alleges that, by lapse of time, by reason of a mistake of the original grantor in respect to the town line, and by the defendants' cutting down and removing line trees marked as monuments, the boundary line between the plaintiff's land and the adjoining land of the defendant Miller has become confused, and prays that it may be established. It does not allege fraud on the part of the defendants, that the line cannot be ascertained without the assistance of equity, or that the rights of anybody except those of the parties to the suit are affected. In short, no ground for equitable jurisdiction is suggested, unless the statement that the boundary line has become more or less uncertain and difficult to find constitutes such ground. 1 Sto. Eq. Jur., ss. 615–622. The defendants' answers, filed early in 1868, aver that the legal title to the part of lot 100 which lies in Madison is in the defendant Miller, and deny the plaintiff's allegations in respect to the confusion of boundaries. These were the only issues tried before the referee, who filed his report in April, 1878. The referee finds that by reason of the removal of marked trees, and other causes, the boundary line between the part of lot 100 lying in Madison and the defendants' adjoining land is, as alleged by the plaintiff, difficult to trace, but that it can be determined to the satisfaction of a

referee or jury. The question of jurisdiction in equity is as distinctly raised upon the face of the bill as it is upon the report of the referee. The defendants might have taken the objection to the jurisdiction by demurrer to the bill. Instead of doing so, they elected to join issue upon the facts. They have had a full hearing upon them without objection on their part to the form of the proceeding. They chose to contest the merits, and take their chance of winning. After nearly sixteen years of litigation they are defeated. It would be a practical denial of justice to the plaintiff to permit them now to turn him out of court upon this objection. All the facts upon which the rights of the parties depend have been fully tried and determined. It does not appear that in this form of proceeding the defendants have lost any advantage which they would have had in an action of trespass or in a writ of entry. Under these circumstances, if for any reason the bill could not be maintained, the plaintiff would be permitted to amend by filing a declaration at law, and take judgment thereon without any further hearing or trial.

*Motion for a rehearing denied.*

STANLEY, J., did not sit: the others concurred.